**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| EDDIE V. GRAY, Trustee of the Carrizo | § | |
| Verde Ranch, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No:  SA-14-CA-1020-XR |
| | § | |
| CHESAPEAKE EXPLORATION, L.L.C., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**ORDER**

On this day the Court considered Defendant's Motion to Dismiss for Failure to State a

Claim.  Docket no. 4.  For the following reasons, the Court DENIES the motion.

## I.        BACKGROUND

On October 16, 2014, Plaintiff Eddie Gray, as trustee of the Carrizo Verde Ranch, LLC,

filed a petition in the 293rd Judicial District of Bexar County, Texas against Defendant

Chesapeake Exploration, L.L.C., alleging breach of an oil and gas contract.  *See* docket no. 1-1.

Plaintiff owns a tract of land (the "Leased Premises") and Chesapeake is the lessee of the mineral

estate.[1]  *See* docket no. 4 at ¶ 2.  Chesapeake removed the case to this Court based on diversity

jurisdiction on November 14, 2014.  *See* docket no. 1.

The parties entered into a surface use agreement (the "Contract") that permits

Chesapeake to explore and develop the Leased Premises, particularly using stimulated hydraulic

fracturing technology, or fracking, in exchange for rent and royalty payments.  Chesapeake's

predecessor-in-interest acquired the mineral lease from Hal and Lisa Berdoll, who later sold the

surface estate to Plaintiff, reserving minerals and half of the water sold from the Leased Premises

---

[1] Chesapeake is sometimes referred to in the Contract as "the Lessee."

1

for themselves.  *See* docket no. 1-1 at ¶¶ 11-12.

The case arises out of a dispute over the Contract.  Plaintiff alleges Chesapeake breached the Contract in four separate ways: 1) building a new road on the Leased Premises without paying for it; 2) laying temporary lines across the Leased Premises to transport water to the well sites without paying for those lines; 3) failing to reduce the pad site area around the wells to the appropriate size within sixty days of completion; and 4) bringing in off-site water to hydraulic fracture the wells instead of purchasing $114,000.00 of on-lease water from Plaintiff at thirty cents per barrel ($0.30) per barrel, or drilling water wells at its own expense, because Chesapeake "must obtain water for their fracture stimulation purposes from the Leased Premises at thirty cents per barrel" and "Chesapeake did not obtain water from the property."  *See* docket no. 1-1 at ¶¶ 14, 15, 18, and 19.

Chesapeake has moved to dismiss only the fourth claim: that it breached the Contract by transporting off-site water to frack wells on the Leased Premises.  *See* docket no. 4 a ¶ 1. Plaintiff responded to the motion to dismiss on December 5, 2014.  *See* docket no. 6. Chesapeake filed its reply on December 12, 2014.  *See* docket no. 8.  Plaintiff then filed a sur-reply without leave of Court on December 19, 2014.  Docket no. 12.  Chesapeake moved to strike docket no. 12 as non-compliant with the Court's rules (docket no. 13), but the Court denied that motion to strike and granted Chesapeake's alternative motion to file a response to the sur-reply.  Docket no. 15.

The Court has subject-matter jurisdiction of this case pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.[2]

---

[2] Plaintiff is a citizen of Texas.  Chesapeake is an LLC in Oklahoma.  "Like limited partnerships and other unincorporated associations or entities, the citizenship of a [limited liability company] is determined by the citizenship of all of its members."  *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). Chesapeake has three members.  Chesapeake has sufficiently alleged that all of its members are citizens of

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim for relief must contain (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a).  In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed favorably to the plaintiff.  *Fernandez–Montez v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993).  To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.*

In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings and the attached documents.  FED. R. CIV. P. 12(b)(6). However, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).  Therefore, the Court may consider the Contract in deciding this motion.

## III.    ANALYSIS

To state a claim for breach of contract under Texas law a plaintiff must plead: "1) the

---

Oklahoma, not Texas.  *See* docket no. 1 at ¶ 6.  The amount in controversy exceeds $75,000.  *See* docket no. 1-1 at ¶¶ 14-19.

existence of a valid contract; 2) that the plaintiff performed or tendered performance; 3) that the defendant breached the contract; and 4) that the plaintiff was damaged as a result of the breach." *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003) (quoting *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.)); *Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482, 491 (N.D. Tex. 2001). The alleged breach of contract at issue in this motion relates to Chesapeake bringing off-site water to the Leased Premises for fracking purposes.

Chesapeake argues that the Contract, specifically § 11.8, is unambiguous and clear that Chesapeake is permitted to bring off-site water to the Leased Premises for fracking purposes, such that Plaintiff has not alleged sufficient facts to demonstrate breach. Chesapeake also appears to argue that Plaintiff does not sufficiently plead damages as a result of the alleged breach. *See* docket no. 8 at ¶¶ 4-7; docket no. 15 at ¶¶ 6-7.

The petition alleges: "Chesapeake must obtain water for their fracture stimulation purposes from the Leased Premises at thirty cents per barrel. Chesapeake did not obtain water from the property, but transported it across the property from another source, thus depriving Gray of the income for same. The estimated number of barrels for fracture simulation purposes is 190,000 per well. At thirty cents each, Chesapeake deprived [Plaintiff] of $57,000 per well, for a total of $114,000." Docket no. 1-1 at ¶ 18. The petition further alleges "Chesapeake laid polyline across the property to transport water to its sites." The petition does not specifically allege that the polyline remained on the property for more than forty-five consecutive days.

It is undisputed that Chesapeake used off-site water for fracking purposes on the Leased Premises without Plaintiff's consent. *See* docket no. 4 at ¶ 2. The only issues before the Court are: 1) whether the Contract permits Chesapeake to bring off-site water to the Leased Premises

4

for fracking purposes; and 2) even if Chesapeake breached the Contract by using off-site water for fracking on the Leased Premises, whether Plaintiff sufficiently pleads damages stemming from that breach.

### A.  Breach

"Under Texas law, the interpretation of an unambiguous contract is a question of law for the court to decide by 'looking at the contract as a whole in light of the circumstances present when the contract was entered.'" *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (quoting *Philadelphia Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 587 (Tex. App.—Fort Worth 2004, no pet.)).  A contract is unambiguous if "it can be given a certain or definite legal meaning or interpretation."  *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.").  "Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist" there must be two or more reasonable interpretations.  *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000); *see also Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002) (citing *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)).  In construing a contract under Texas law, courts must consider the entire writing and give effect to all provisions such that none are rendered meaningless.  *Int'l Turbine Servs.*, 278 F.3d at 497 (citing *Coker*, 650 S.W.2d at 393).

The relevant terms of the Contract are §§ 11.5 and 11.8.  The heart of the dispute lies in § 11.8:

> No water may be hauled or transported to the Leased Premises for any purpose whatsoever without the prior written permission of [Plaintiff], which consent and permission shall not be unreasonably withheld. Notwithstanding the forgoing, to accommodate fracture

> stimulation operations, [Chesapeake] may lay temporary water pipes across the Leased Premises from its sources of water to the Well Location during Operations for a period not to exceed forty five (45) consecutive days.

Docket no. 1-1, ex. C (the "Contract") § 11.8.  Section 11.8 continues,

> [Chesapeake] shall create a cross over where any such waterline crosses a roadway.  [Chesapeake] may not use water from [Plaintiff's] tanks, wells, streams.  Water may be produced at [Chesapeake's] expense and purchased from [Plaintiff] at a price of thirty cents ($.30) per barrel.  Such purchased water shall be obtained from wells existing at the time this agreement is signed or from tanks specified by [Plaintiff].  [Chesapeake] may at [Chesapeake's] sole expense drill one or more water wells drilled and equipped by [Chesapeake] to [Plaintiff's] written and reasonable specifications at mutually agreeable locations on the Leased Premises, and use the water from such Wells for [Chesapeake's] Operations with no obligation to compensate [Plaintiff] for the use of such water from such wells.

*Id.*

Plaintiff contends that § 11.5 should also inform the Court's analysis.  It reads, in relevant part,

> Neither salt water nor any fluid or chemical shall be admitted or injected into any zone underlying [Plaintiff's] land, except a zone below any reasonable probability of contaminating any usable water supply, and then only with [Plaintiff's] written consent, such consent not being unreasonably withheld or delayed.  *No off Leased premises water may ever be injected without the consent of [Plaintiff].*

*Id.* at § 11.5 (emphasis added).[3]

_____

[3] Section 11.5 begins:

> In any well drilled by or for Lessee, Lessee shall set or cause to be set such character and amount of surface casing as may be required by law or by any rule, regulation or order of either the Texas Commission on Environmental Quality or the Texas Railroad Commission or any other governmental body or agency having jurisdiction or authority in the matter, or as necessary to protect any fresh water sands encountered in the drilling of any such well. In the event any Surface Location or Well Locations on the Leased Premises shall discharge water, oil, gas, including salt water, sulfur water, or other waters, Lessee shall not permit such water, oil, gas, or other mineral to flow unrestrained over [Plaintiff's] land, but instead shall contain the same, preventing it securely from penetrating, seeping, or flowing into any fresh water formation below the surface by

Plaintiff argues that it is unambiguous and clear under the Contract, specifically §§ 11.5 and 11.8, that Chesapeake cannot bring off-site water to the Leased Premises for any purpose without Plaintiff's permission, as the word "its" in the "notwithstanding the foregoing" sentence refers to the Leased Premises.  Plaintiff also argues the "notwithstanding the foregoing" sentence "deals with laying temporary water lines, which the parties agreed would not require permission . . . It does not expand, broaden, limit or modify the part of § 11.8 which clearly states that '[n]o water may be hauled or transported to the Leased Premises for any purpose whatsoever' . . . The provisions . . . relate to how water may be temporarily hauled and transported on the premises."  Docket no. 6 at ¶ 8.  In the alternative, Plaintiff argues that, at least, the Contract is ambiguous such that the claim should survive a motion to dismiss, even assuming Chesapeake's interpretation of § 11.8 is correct, because §§ 11.5 and 11.8 appear to give contradictory directives.  Chesapeake argues that § 11.8 of the Contract unambiguously permits it to bring in off-site water from "its" own sources for fracturing purposes, because "notwithstanding the foregoing" is a limitation on the previous sentence's ban on off-site water, "its" means "Chesapeake's," and there is no restriction of off-site sources to "its sources" in the sentence. The Court is not persuaded at this time that the Contract is unambiguous or that either party's construction of the contract is correct as a matter of law.

The first sentence of § 11.8 is a clear ban on off-site water for any purpose:  "No water may be hauled or transported to the Leased Premises for any purpose whatsoever without the prior written permission of [Plaintiff], which consent and permission shall not be unreasonably

---

lining all pits to be used in lessee's operations and from flowing into any tank, reservoir, or water course on the surface.  Lessee is hereby charged with the duty of seeing that no such water, oil, gas, or other mineral shall injure the surface or subsurface of the land, lakes, or ponds on the land, or penetrate fresh water formation beneath the surface.  Lessee further agrees that any water-bearing strata encountered in the drilling of any well on the [Leased Premises] will be securely cased and/or cemented off in accordance with state regulations and so that the waters therein will not escape and run into any other stat or formation.

withheld."  Read only in context with the rest of § 11.8, the "notwithstanding the foregoing" language in the second sentence appears to create a carve-out for Chesapeake to bring water from its sources, on-site or off-site, to the Leased Premises, as Chesapeake can "lay temporary water pipes across the Leased Premises from its sources of water to the Well Location." *See Knight v. Chicago Corp.*, 188 S.W.2d 564, 566-67 (Tex. 1945) (stating the term "notwithstanding" in a contract is construed as a limitation or restraint on the clause preceding it).

The Court, however, cannot reconcile Chesapeake's offered interpretation of the second sentence of § 11.8 with the last sentence of § 11.5, which definitively bans the "injection" of off-site water for any purpose, including fracking, without Plaintiff's consent.  Section 11.5 is titled "Drilling Operations – Discharge and Protection of Fresh Water."  It sets out what fluids can be injected during the fracking process, and lists several precautions Chesapeake must take to protect the Plaintiff's groundwater.  The second-to-last sentence of § 11.5 bans the injection of salt water or other fluid without Plaintiff's consent.  The last sentence then states, "No off Leased Premises water may ever be injected without the consent of the [Plaintiff]."  The last sentence is the final item on a list of precautions set out in the Contract to protect the groundwater from contamination; an unequivocal ban on injecting off-site water into wells on the Leased Premises without Plaintiff's permission.

Chesapeake argues the last sentence is only meant to bolster the previous sentence's ban on saltwater and fluid and has no impact on the reading of § 11.8.  *See* docket no. 8 at ¶ 6 ("Plaintiff cites [§ 11.5] prohibiting injection of saltwater rather than extraction of freshwater.").[4]

---

[4] This statement is actually made to rebut Plaintiff's contention in his response to the motion to dismiss that "[t]there is no provision that allows Defendant to bring water from offsite to use on the leased premises."  Docket no. 6 at ¶ 12. The Court generously reads this as an argument about why § 11.5 is not fatally contradictory to Chesapeake's interpretation of § 11.8, because otherwise Chesapeake never addressed how its interpretation of § 11.8 and the plain

In order to grant this motion to dismiss, the Court must agree with Chesapeake's interpretation that § 11.8 unambiguously permits Chesapeake to bring off-site water to the wells on the Leased Premises without Plaintiff's consent because the Contract states "notwithstanding the foregoing . . . [Chesapeake] may lay temporary water pipes across the Leased Premises from its sources of water," with "its" meaning Chesapeake's.  Such a holding requires the Court to find that the last sentence of § 11.5 does not impact the rest of the Contract, including § 11.8, leaving the rather absurd result that the Contract permits Chesapeake to transport water to its wells from "its" sources of water to the Leased Premises for fracking purposes under § 11.8, but cannot use or inject the water under § 11.5.

The Court is thus not persuaded by either party of the meaning of the Contract regarding the transport of Chesapeake's off-site water to the wells on the Leased Premises for fracking purposes, given the apparent contradiction in §§ 11.5 and 11.8.  Section 11.8 cannot be given a certain or definite legal meaning or interpretation at this time given the language in § 11.5, *see Coker*, 650 S.W.2d at 394, because the Court must consider the entire Contract and give effect to all provisions such that they are not rendered meaningless or given meanings that lead to absurd results the parties could not have intended, *see DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).  Accordingly, the Court denies Chesapeake's motion to dismiss this claim based on Chesapeake's assertion that the Contract unambiguously permits it to bring off-site water to the Leased Premises for fracking purposes.

### B.  Damages

Chesapeake appears to argue that Plaintiff fails to state a claim because he does not properly allege damages resulting from the alleged breach.  *See* docket no. 4 at ¶ 7; docket no. 8 at ¶¶ 6-7.  The petition alleges, "[t]he estimated number of barrels for fracture stimulation

language of § 11.5 might be harmonized in the briefing.

9

purposes is 190,000 per well.  At thirty cents each, Chesapeake deprived [Plaintiff] of $57,000 per well, for a total of $114,000."  Docket no. 1-1 at ¶ 18.  Again, § 11.8 of the Contract states

> [W]ater may be produced at [Chesapeake's] expense and purchased from [Plaintiff] at a price of thirty cents ($.30) per barrel.  Such purchased water shall be obtained from wells existing at the time this agreement is signed or from tanks specified by [Plaintiff].  [Chesapeake] may at its sole expense drill one or more water wells . . . and use the water from such wells for [Chesapeake's] Operations with no obligation to compensate [Plaintiff] for the use of such water from such wells.

Further down, § 11.8 states, "Upon the expiration of the [Contract] on which [Chesapeake's] water well or wells are located, [Chesapeake's] rights in any such water well(s) shall terminate . . . and ownership of said water well(s) shall vest in [Plaintiff]."  Contract § 11.8.

Chesapeake argues that the "thirty cents per barrel" provision can only be utilized to calculate damages if the company had used existing water sources from the Leased Premises for its fracking operations.  *See* docket no. 4 at ¶ 7; docket no. 8 at ¶¶ 4-7.  Chesapeake also argues that the Contract contemplates transporting off-site water to the Leased Premises, at least with Plaintiff's permission, and sets out no payment schedule for off-site water.  Docket no. 8 at ¶¶ 2-3, and 7.  Plaintiff argues the thirty cents per barrel provision applies because Chesapeake was not allowed to bring off-site water and the provisions relating to newly drilled wells are irrelevant to this case because Chesapeake did not drill any wells.  Docket no. 6 at ¶ 11.  In the alternative, in his sur-reply, Plaintiff argues that, should the Court conclude the thirty cent per barrel provision is not appropriate to calculate damages for off-site water used in the fracking operations on the Leased Premises, "some damage for the breach can still be proven economically."  Docket no. 12 at ¶ 4.

While this lacks specificity, presumably Plaintiff would show that, without permission to bring in off-site water, Chesapeake would have had to pay either the thirty cents per barrel for

existing water sources or drill new water wells that Plaintiff would have gained ownership of after the expiration of the Contract.  *See* Contract § 11.8.  Damages for not drilling a new well are harder to calculate, but are another measure of expectation damages[5] Plaintiff allegedly suffered due to Chesapeake's breach.  *See Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001) (holding a breach of contract claim survived a motion to dismiss because it alleged expectation damages stemming from the breach).  By transporting in off-site water for fracking purposes, if that was a breach of the Contract, Chesapeake caused some economic, expectation damages to Plaintiff.

Plaintiff pleads he was damaged by the alleged breach and offered one way to calculate his expectation damages.  That is enough to satisfy the damages element of a breach of contract claim.  *See Coghlan*, 240 F.3d at 454; *see also Mason v. F.D.I.C.*, 888 F. Supp. 799, 807 (S.D. Tex. 1995) (in a tort case: "allegations of damages are all that is required to withstand a Rule 12(b)(6) motion to dismiss").

## IV.    CONCLUSION

For all of the above reasons, Defendant's Motion to Dismiss for Failure to State a Claim (docket no. 4) is DENIED.

It is so ORDERED.

SIGNED this 26th day of January, 2015.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[5] Sometimes called "benefit-of-the-bargain" damages.